## INTERSTATE BUILDING AND LOAN ASSOCIATION
### v. WOOTEN.

1. While a private corporation may at any time exercise in a lawful manner its inherent right to amend, alter, or repeal its by-laws, no amendment, alteration, or repeal thereof can have the legal effect of defeating any vested right of its stockholders. This is true because, under the fundamental law of the land, power to adopt by-laws impairing the obligation of a contract can not be constitutionally conferred upon a corporation. Accordingly, though a mutual association may in its by-laws reserve to itself power to prescribe from time to time how its business shall be conducted, yet after it has entered into a special contract with one of its members, its obligations under such special contract can not be impaired by the repeal of by-laws with reference to the provisions of which it was made, or by securing an amendment to its charter designed to bring about such a result.

2. It follows that where an advance was made to a borrowing member of a building and loan association in accordance with the terms of existing by-laws, under one of which he was accorded the privilege of discharging his indebtedness to the association on the basis of the payment by him of 84 monthly installments of dues and interest, his vested right under his contract of loan to avail himself of this privilege could not be defeated by any subsequent change in the internal law of the association, whether effected by an alteration in its by-laws or through an amendment to its charter.

Submitted March 2, — Decided April 26, 1901.

Complaint. Before Judge Reese. Wilkes superior court. May term, 1900.

*S. H. Hardeman* and *W. A. Wimbish*, for plaintiff.
*Colley & Sims*, for defendant.

LUMPKIN, P. J. In the early part of 1893, Mrs. Georgia L. Wooten became a member of the Interstate Building and Loan Association. Among the by-laws which had been adopted by the association and which were of force at that time was one providing that "Amendments to these by-laws may be made by the board of directors by a majority vote." Subsequently, after paying five monthly installments of dues, Mrs. Wooten applied for and obtained an advance of $2,000 upon forty shares of stock held by her. The contract with the association under which she procured this advance was evidenced by a bond executed by her and delivered to it on June 17, 1893, which recited the fact that, "to secure the payment of the " advance or loan made to Mrs. Wooten, she had "conveyed to said association a certain house and lot in Washington, Ga." It was expressly stipulated in this bond, "that, under

the conditions prescribed by the by-laws of said association, said loan and interest on same [were] to be paid in monthly installments as agreed, and in accordance with the by-laws, rules, and regulations of the association, in direct reference to which the bond [was] made, and in all cases [it was] to be construed as making said by-laws, rules, and regulations, when applicable, as a part" thereof.    There was in the bond a further provision to the effect that in the event Mrs. Wooten made default in meeting the obligations assumed by her with reference to the payment of monthly installments, and such default continued "for a period of six consecutive months," then the loan and accrued interest thereon, as well as all fines imposed in accordance with the by-laws, should "become immediately due and payable," etc.    One of the by-laws under which the association transacted business at the time it made to Mrs. Wooten the advance or loan in question provided that: "Loans on real estate may be repaid at any time after one year, on thirty days notice, on the following terms: The number of monthly payments shall be deducted from 84 (this number of months being estimated time of maturity), and the remainder will show the number of payments to be made to mature the loan; the number of payments thus ascertained shall be multiplied by the amount of each monthly payment; this product will show the amount that would be paid by borrower should he continue his monthly payments as under the contract; as he, however, makes this as an advance payment, he will be allowed a discount of six per cent. per annum for average time of advance payment."    The stock issued by the association to Mrs. Wooten belonged to what was known as "Class A."    "At the annual meeting of the shareholders of said association in July, 1897, it was unanimously resolved as follows: 'As each series of stock in Class A shall attain the age of ninety-eight months (not including the month of issue), such series may be wound up; the borrower may be released from further payments; his stock may be canceled, and his security released and returned to him.'"    At that meeting "the board of directors of the association was authorized to apply to the superior court for a change in the charter, incorporating therein the above resolution; and on September 10, 1897, in Muscogee superior court, the same was incorporated in the charter as an amendment," which went into effect October 1, 1897.    Mrs. Wooten did not attend in per-

son or in any manner participate in the meeting just referred to; nor, so far as appears, did she subsequently ratify the action taken by those of the stockholders who were present, or consent to the change effected in the charter of the association by way of amendment. It is inferable from the record before us that, after this amendment was secured, the board of directors passed a by-law embodying the terms thereof, and at the same time repealed the by-law whereby borrowers were permitted to repay loans on the basis of 84 monthly installments.

" Some time about July, 1898, Mrs. Wooten notified the association that she desired to settle in full the loan" made to her, "according to the terms of her contract, and asked for a statement of the amount due. In reply, the association sent her a statement requiring a settlement on the basis" of 98 monthly installments, as provided for in the amendment to its charter; and she thereupon "refused to settle on this basis, on the ground that it required of her payment of more than she was due on a proper basis of settlement." She "did not offer to settle for any specified or definite amount," but notified the association that she claimed the right to stand upon her contract with it as written; and on its insisting upon the payment of 98 monthly installments as the only basis upon which a settlement could be had, she declined to make further monthly payments. Thus the matter stood for a period of nine months, when the association brought suit against Mrs. Wooten upon her bond, claiming that she had committed a breach thereof, and accordingly that the principal of the loan made to her, together with interest thereon and certain fines, had become due and payable. In defense to this action Mrs. Wooten filed an answer in which she alleged her offer to settle with the association in accordance with the express terms of her contract with it, and its refusal to allow her so to do, on the ground that she was bound by the terms of the amendment to its charter. She further interposed the defense of usury, based upon the allegation that the manner in which the plaintiff conducted its business was not such as could be legitimately pursued by a building and loan association, pure and simple, in furtherance of "the purposes contemplated by law." On the trial of the case, "the court ruled that Mrs. Georgia L. Wooten had the right to pay in full her loan from the association on the basis and terms prescribed by the by-laws . . which were of force on June 17,

1893, when she obtained the loan and executed the bond aforesaid, and that the amendment to the charter and by-laws made September 10, 1897, was inoperative as to her." In accordance with this ruling, his honor, after both sides had announced closed, directed the jury to find for the plaintiff the amount due to it under the provisions of the by-law above quoted, whereby borrowers were permitted to repay loans upon the basis of 84 monthly installments. To this action of the court both sides excepted. In its bill of exceptions, the association assigns error upon the ruling that Mrs. Wooten was not bound by the amendment to its charter; whereas she, by a cross-bill of exceptions, complains that the court erred in directing a verdict in favor of the plaintiff, because, " under the evidence, there was an issue to be passed on by the jury as to whether or not her plea as to usury in the loan contract had been established." Under the view which we entertain of the case, it is, however, only necessary to deal with the point raised by the main bill of exceptions.

1. Unquestionably it is within the power of a corporation to pass such by-laws as are not inconsistent with its charter and the purposes for which it was created. And, as an incident to this power, a corporation may be said to have the right to alter, amend, or repeal its by-laws, from time to time, as the exigencies of the occasion may render necessary and proper. But even an express grant of authority thus to effect changes in its by-laws does not carry with it any right to exercise such authority in violation of the fundamental law of the land. It is to be remembered that our Federal constitution in terms provides that no State shall have power to pass any "law impairing the obligation of contracts;" and it follows, of course, that a statute which provides generally that a corporation shall have authority to alter its by-laws, from time to time, is not to be understood as contemplating that the authority thus conferred may be exercised in such manner as injuriously to affect the vested rights of any person between whom and the corporation there exists a contractual relation. To otherwise construe such a statute would be to necessarily pronounce it unconstitutional, and therefore wholly inoperative. Clearly a corporation can not assume to exercise any right which it was not within the power of its creator to bestow upon it. So it is that: " A by-law can not disturb a vested right any more than a statute; indeed they are, in this respect, on

the same plane. And although a corporation has the power of amending its by-laws, yet, inasmuch as they enter into and form a part of the contracts it makes with its members, they can not, under the guise of amending its by-laws, impair the obligation of such contracts. Thus a resolution of the board of directors, or an amendment to the constitution, of a building association, which modifies the rights of borrowing members, . . is *ultra vires.*" See Thornton & Blackledge on Building & Loan Assns. § 131, and cases cited. " If a by-law permit withdrawals when a member joins a society, he can not be deprived of that privilege thereafter without his consent" (Holyoke Assn. *v.* Lewis, 1 Col. App. 127; Auld *v.* Glasgow Assn., 12 App. Cas. 197); though amendments "which do not increase his obligations, but provide a different method of withdrawing, are valid" (Hekelnkæmper *v.* Assn., 22 Kan. 549), further say the authors of the text-book just cited. See also, in this connection, 7 Thomp. Corp. § 8729, and Endlich on Building Assns. § 272. A full and able discussion as to what should be regarded as a legitimate exercise by a mutual loan association of its power to amend its by-laws is to be found in the carefully-considered case of Engelhardt *v.* Association, 148 N. Y. 281, 35 L. R. A. 289. There it was very properly held that a " by-law to the effect that withdrawing members should be paid in the order of the presentation of their applications was a reasonable regulation and binding upon all members alike, including those who had become members before its adoption." Obviously the by-law in question did not affect the vested rights of any member, for his privilege of withdrawing from the association was one which he held in common with his fellow-members, over whom he had no precedence; and the mode prescribed for dealing with applications for withdrawal was eminently just and fair to all concerned.

We find in the second edition of the American and English Encyclopædia of Law (vol. 4, p. 1047) the following statement: " As to the question whether a by-law granting a right of withdrawal can be altered so as to take away or modify that right, the courts are at variance. It has been held, on the one hand, that such a by-law creates a vested right, and that any attempt to change it will be ineffectual. On the other hand, it has been held that an association having power to change its by-laws may make the alteration in question, as the member holds his membership rights subject to

having them modified by the body of which he forms a part." It is worthy of note that in support of the doctrine that "such a by-law creates a vested right," American cases are cited, while English decisions alone are referred to as authority for the counter proposition. In the case of Pepe *v.* Building Society (1893), 2 Ch. 311, it appeared that: "By one of the rules of the society, a member on giving one month's notice in writing might withdraw his shares. The rules also provided that they might be altered by a majority of three fourths of the members. The plaintiff gave the requisite notice of withdrawal; but, after such notice and before he was re-paid, the above rule was altered by giving the directors power to pay off in priority members holding less than £50 in the society." Under these facts, the court reached the somewhat remarkable conclusion "that although the plaintiff had, at the date of his notice of withdrawal, under the rule then in force, a vested right to be paid the amount due on his shares, he being still a member of the society was liable to have this right divested by a subsequent alteration in the rule duly made, and that he was therefore bound by the altered rule." This decision, and others of like import, seem to have been predicated upon the idea that, under the "building societies act of 1874" (37 & 38 Vict. c. 42), an association chartered thereunder had authority to change its by-laws at any time, even after its members had acquired vested rights in the premises. See Davies *v.* Building Society, 61 L. T. N. S. 680; Bradbury *v.* Wild (1893), 1 Ch. 377; Barnard *v.* Tomson (1894), 1 Ch. 374; Kemp *v.* Wright (1894), 2 Ch. 462; Botten *v.* Building Society (1895), 2 Ch. 441. Tested by our fundamental law, a statute of that character would be clearly unconstitutional. Fisher *v.* Patton, 134 Mo. 32, 52. It is undoubtedly true that a corporation may, if it so desires, expressly reserve to itself the right to prescribe, from time to time, how its business shall be conducted; and one subscribing to stock upon the understanding that such right may be exercised in a legitimate manner can not be heard to assert that by-laws of force at the time he became a shareholder set forth the terms of his contract with the corporation, and therefore can not be amended or repealed without his consent. Thornton & Bl. B. & L. A. § 131, pp. 129, 130; Borgards *v.* Insurance Co., 79 Mich. 440; Supreme Lodge *v.* Knight, 117 Ind. 489; Supreme Commandery *v.* Ainsworth, 70 Ala. 437; Bearden *v.* Association, 49 S. W. Rep. 64.

That is to say, an agreement of this nature will be effectual, provided, of course, it does not militate with some special enactment on the subject, such, for example, as a statute which in effect declares, as matter of public policy, that the right of a member of a mutual association to withdraw therefrom, upon specified terms and conditions, is one which can not legally be waived.　7 Thomp. Corp. § 8729; Latimer *v.* Equitable L. & I. Co., 81 Fed. Rep. 776.

Where one, on joining a building and loan association, voluntarily consents that it may subsequently alter, amend, or repeal then existing by-laws, in so far as they relate to the plan upon which its business shall be transacted, the only vested right which he acquires by reason of his contract of membership is that he shall at all times stand upon an equal footing with his fellow-members as regards the privileges extended to and the burdens imposed upon them.　This being so, should he thereafter desire to rescind that contract and cease to be a member, he would be entitled to do so upon such terms only as the association was for the time being inviting its stockholders to accept; though, upon his giving due and formal notice of his acceptance of the offer then extended to members wishing to sever their connection with the association, his privilege of withdrawing therefrom upon those terms would immediately become a vested right which could not be defeated by its tardily undertaking, by means of a change subsequently effected in its by-laws, to recall the offer thus voluntarily made by it. What has just been said is to be understood as applying to such stockholders only as are commonly known as non-borrowers or investors.　A borrowing member would stand upon a somewhat different footing.　It is to be borne in mind that one of the distinguishing characteristics of a mutual building and loan association, as compared with private corporations in general, is that, in duly transacting its legitimate business, such an association ordinarily deals exclusively with its members.　If, after joining an association of this kind under a contract of membership such as that above indicated, a shareholder desires to procure a loan, the terms and conditions upon which the same shall be made to him must necessarily become the subject-matter of another and distinct contract between him and the association.　As a general rule, it is agreed that the loan be made in accordance with then existing by-laws prescribing the terms upon which advances may be made to members upon

shares of stock held by them. ˙ Accordingly, such by-laws are to be regarded as setting forth the terms of this special contract (*Barbot* v. *Mutual Assn.*, 100 *Ga.* 681, 694-695), a contract which the association would have no right to repudiate at will, or, by a change in its by-laws subsequently made, to impair or totally destroy. Becker *v.* Insurance Co., 48 Mich. 610. And if provision be made in the by-laws then of force that the borrower shall be permitted to thereafter withdraw from the association, upon compliance with certain specified conditions respecting the repayment of the loan made to him, it is clear that the privilege thus accorded to him by the express terms of his contract immediately becomes one of which he has a vested right to avail himself at his election. We do not mean to say the association would not be at liberty to stipulate with the borrower, as a condition precedent to making him a loan, that, as to the privilege of withdrawal or as to like privileges then being accorded to its members, it reserved the right to subsequently effect changes in its by-laws. In the absence of any statutory restrictions in regard to the matter, such a stipulation, if assented to by the borrower, would certainly be binding upon him. An instance in point is afforded by the case of Rosenberg *v.* Building Society, L. R. 22 Q. B. 373, wherein it appeared that this course had been pursued. A borrowing member gave to the society a mortgage which embraced a covenant by him " to pay to the society all subscriptions, fines, and other moneys which, according to the rules for the time being of the society, should from time to time become due and payable by him in respect of the security or the shares by virtue of which the advance was made to him." Subsequently by-laws were adopted which prescribed that no advanced member should " be entitled to redeem his mortgage without paying, in addition to what would have been due from him under the original rules, his proportion of the losses of the society;" and it was held that the new rules were to be looked to in determining upon what terms the mortgagor in question had a right to withdraw from the society. In any given case the inquiry should be : What was the contract between the parties ? That contract, whatever may be its terms, should, if enforced at all, be given the effect it was intended to have. This doctrine is in accord with good law, good morals, and common justice.

2. Applying to the facts of the present case the principles of

law above announced, we have no hesitation in holding that the ruling complained of in the main bill of exceptions was free from error.    In the first place, it is gravely to be doubted that the framers of the by-law the terms of which are quoted in the foregoing preliminary statement of facts, and which is now relied on as amounting to an express reservation by the association of power to effect changes in the plan originally adopted as that upon which its business should be conducted, even remotely contemplated that this by-law would ever be so construed.    The more reasonable interpretation of it would seem to be that its real purpose was simply to provide that whatever power the association might have to make "amendments" to its by-laws should reside in its board of directors, and be exercised by the members of that body rather than by others of its officers or by its stockholders.    To otherwise interpret this by-law would be to subject it to censure as presenting a countenance far from ingenuous.    Its bare recital that "amendments" to the by-laws might be made by the board of directors was hardly calculated to convey notice to persons of ordinary intelligence that the association thereby sought to reserve to itself power to wholly dismember or totally destroy its existing by-laws, by way of radical alteration, absolute repeal, or the adoption of new by-laws of an altogether different character.    However, it may, for the purposes of this particular case, be conceded that the by-law under discussion was intended to have, and did in fact have, the force and effect now claimed for it by the association.    Upon this assumption, the following conclusions would seem to be inevitable:    (1) Although Mrs. Wooten might, when she joined the association, have been under the impression that she could at any time secure an advance on her shares of stock upon such terms as the by-laws then of force prescribed, still if a change therein was effected in the authorized manner before she actually applied for a loan, she would, in order to obtain the same, have to assent to the terms and conditions upon which the association was for the time being making loans to its members.    (2) But as she was actually granted a loan before any such change took place, and in the bond given by her it was expressly stipulated that the by-laws of the association, in so far as the same were applicable, were to be regarded as constituting a part of her written contract, no change in those by-laws subsequently made could possibly affect her vested rights in the

premises.    The by-laws to which reference was made in her bond
were, of course, those in existence at the time that instrument was
executed.    See Becker *v.* Insurance Co., supra, which was cited ap-
provingly in Bogards *v.* Insurance Co., 79 Mich. 442.    She can not
reasonably be supposed to have contracted with reference to by-laws
not then in existence, for certain it is that her bond contains no
covenant to the effect that she would consider herself bound by
such by-laws as might subsequently be adopted.    It is equally clear
that no amendment to the charter of the association could have
the legal effect of depriving Mrs. Wooten of any vested right
which she acquired under and by virtue of her contract with it.
Fisher *v.* Patton, 134 Mo. 52–53.    One of the by-laws of force at
the time that contract was entered into provided that borrowers
should have the right to repay their loans and be discharged from
all liability, upon their settling with the association upon the basis
of 84 monthly installments of dues and interest.    She duly sought,
but was denied, the privilege of discharging her indebtedness to the
association upon that basis.    It insists that it had the right to com-
pel her to make to it 98 monthly payments, agreeably to the in-
ternal law of the association at the time she gave notice of her
election to withdraw therefrom.    This claim can not, in justice to
Mrs. Wooten, be sustained upon any principle of law or equity of
which we are aware.

Our attention has been called to the fact that in a similar legal
controversy between this same association and one Juliet Hafter,
which arose under circumstances almost identical with those dis-
closed by the record in the present case, the Supreme Court of Mis-
sissippi looked favorably upon practically the same contentions as
are now relied on by the association.    Interstate B. & L. Assn. *v.*
Hafter, 76 Miss. 770.    The argument advanced in support of the
conclusion reached in that case was to the effect that, as the asso-
ciation had reserved to itself power to amend its by-laws, a borrow-
ing member, who did not give notice of his election to repay the
loan made to him until after the repeal of a by-law prescribing the
terms upon which borrowers might exercise the privilege of with-
drawal, lost all right to call upon the association to settle with him
upon those terms, notwithstanding the by-law in question was of
force at the time such loan to him was made.    As applied to an
investor or non-borrowing member, this line of reasoning would be

perfectly .sound; but, as we have already endeavored to show, borrowers or advanced members stand upon an altogether different footing. Could it for a moment be contended that one belonging to the latter class would, after assenting that his contract of loan should be governed by the terms set forth in by-laws of force at the time he procured an advance, have the right to thereafter repudiate this solemn agreement and insist upon a settlement with the association upon the basis of by-laws. subsequently passed which were more favorable to borrowers than those with reference to which he contracted? In support of the decision just referred to only two cases were cited: Knights of the Golden Rule v. Ainsworth, 71 Ala. 436; Knights of Pythias v. Knight, 117 Ind. 489. In our opinion, neither of them sustains the proposition upon which that decision was based. In the former, it appeared that a mutual life-insurance company executed and delivered to one of its members a benefit certificate which embraced a stipulation to the effect that the same was issued subject not only to the laws of the order then of force, but also to such as might thereafter be enacted. After the certificate was issued, but before the death of this member, a by-law was passed providing for a forfeiture in the event a member, whether sane or insane, should take his own life. The inevitable conclusion reached by the court was that, in view of the express stipulation above referred to, the beneficiary named in the certificate was bound by the provisions of this new by-law. A similar ruling was announced in Knight's case. Upon its facts, it is even more remotely in point.

Not long since, we were called upon by another member of the same association which is a party to the present action to construe a contract evidenced by a bond signed by him, the terms of which were expressed in almost the identical language employed in the bond signed by Mrs. Wooten. *Maynard* v. *Interstate B. & L. Assn.*, 112 *Ga.* 443. We sustained the contention upon which the association then saw fit to rely, holding that a bond executed by an advanced member " on the date of receiving the advance, by the terms of which the by-laws of the association are made a part thereof, must be treated as referring to the by-laws as they stood on that date." It appeared in that case that at the time Maynard joined the association, and on the date upon which he made his application for a loan, the by-law according to borrowing members the right to

withdraw upon settling with the association on the basis of 84 monthly installments of dues and interest was of force.    But, prior to the date on which the loan was actually made and his bond was signed and delivered, this by-law had been repealed, though he was ignorant of the fact.    There was no effort on his part to have his bond canceled on the ground of fraud or mistake; nor was any question presented concerning his right to have refused to sign the bond as written, on the ground that he was entitled to a loan made in accordance with the by-laws as they stood on the date of his application.    On the contrary, having signed the bond without protest, he elected to stand on the contract as therein expressed, and merely asked this court to construe the same and give to it its legal effect.    This, and this alone, we undertook to do.    The opinion in that case was delivered by Mr. Justice Lewis, who cited the Hafter case, supra, in support of the proposition that where the stockholders of a corporation expressly agree that its by-laws may be amended or repealed, they can not rely upon the assumption that the same will remain unchanged, but are bound to take notice of such alterations therein as may be effected in the usual and proper way.    He did not undertake to say whether that proposition was, or was not, applicable to the peculiar facts of that case.    After careful consideration, we now feel prepared to assert with much confidence that it was not.    The conclusion at which we have arrived with regard to this branch of the case at bar is, we think, in perfect harmony with all of the decisions bearing on the subject which this court has heretofore rendered.    In this connection, see *Insurance Co.* v. *Gibson*, 52 *Ga.* 640; *Barbot* v. *Association*, 100 *Ga.* 681; *Morgan* v. *Association*, 108 *Ga.* 185; *Crittenden* v. *Association*, 111 *Ga.* 266. Indeed, we rely upon these cases as directly supporting several of the propositions upon which our present decision is based.    As it leads to an affirmance of the judgment on the main bill of exceptions, there is no occasion for us to pass upon the merits of the complaint presented by the cross-bill.

*Judgment on the main bill of exceptions affirmed; cross-bill of exceptions dismissed.    All the Justices concurring.*